CENTER FOR DISABILITY ACCESS
Ray Ballister, Jr., Esq., SBN 111282
Phyl Grace, Esq., SBN 171771
Dennis Price, Esq., SBN 279082
Sara Gunderson, Esq., SBN 302582
Mail: PO Box 262490
San Diego, CA 92196-2490
Delivery: 9845 Erma Road, Suite 300
San Diego, CA 92131
(858) 375-7385; (888) 422-5191 fax
sarag@potterhandy.com

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**Shirley Lindsay**,

    Plaintiff,

v.

**Overland Partners Sepulveda, LLC**, a California Limited Liability Company;
**Starbucks Corporation,** a Washington Corporation;

    Defendants.

**Case:** 2:18-CV-01917-GW-PLA

**Plaintiff's Second Reply to Defendant's Opposition to Plaintiff's Motion for Summary Judgment, or in the alternative, Partial Summary Judgment**

Date:  April 10, 2019
Time:  1: 30 p.m.
Ctrm:  9D (9th Floor)

Hon. Judge George H. Wu

## I. Preliminary Statement

Plaintiff offers this second Reply in response to Defendant Starbucks Corporation's Further Opposition to Plaintiff's Motion for Summary Judgment or, In The Alternative, Partial Summary Judgment, filed on March 11, 2019, and specifically incorporates and supplements her Reply to

1

Defendant's Opposition to Plaintiff's Motion for Summary Judgment, or in the alternative, Partial Summary Judgment filed on November 26, 2018.

## II. The Transaction Counters at the Subject Property Constitute an Unlawful Barrier

Defendant points to the DOJ amicus brief filed in *Johnson v. Starbucks Corporation*, Case No. 17-cv-02454-WHA, a matter coincidentally handled by Plaintiff's counsel in this matter, to support its Opposition. However, the DOJ's amicus brief is a study in semantics that does not reach the ultimate issue in this case. The DOJ states that the *standard*, i.e., the building code for counters, does not require "clear" space. This is true. Technically, how a counter is used is an *operational issue*, not an issue for an architect/contractor. So, Starbucks has built a compliant counter in conformance with the physical *standard*. But this hardly ends the dispute. Plaintiff's complaint is about how the counter is used, i.e., that Starbucks places merchandise on it, thereby converting a required 36-inch wide transaction counter to a merchandise display stand with only a small transaction space. The ADA not only requires facilities to be designed and built to a standard but also requires that those facilities be "maintained" in readily accessible and useable condition. 28 C.F.R. § 36.211(a).  In fact, Mr. Johnson cited this maintenance regulation to the DOJ. Every court to rule on this subject has cited this maintenance regulation. Yet the DOJ never addresses it and, in fact, states that it is not opining on any other issue. But this court needs to address it.

### A. *The highly technical and limited nature of the DOJ's opinion.*

The DOJ states that "nothing in section 904.4.1 so much as mentions, much less requires, that the counter space required by the 2010 Standards be 'clear.' Accordingly, Defendants' alleged failure to provide 36 inches of clear

2

Second Reply                                                                 Case: 2:18-CV-01917-GW-PLA

counter space *does not violate Section 904.4.1*. The United States takes no position on any other issue in this case." DOJ Brief, p. 1, lines 25-28 (emphasis added). The DOJ's decision to limit its opinion to merely what 904.4.1's plain language requires is frustrating. It is true that section 904.4.1 does not use the word "clear" and, therefore, cannot be said to require 36 inches of *clear* counter space. Technically, 904.4.1 does not require a single millimeter of clear, useable space for wheelchair users. Similarly, the standard to provide a 60-inch-wide-access aisle adjacent to an accessible parking space does not use the word "clear" and, therefore, a business would not run afoul of this standard if it placed pallets and popup tenants on the required space. 36 C.F.R., Part 1191, Appendix D, § 502.3.1. Or consider the standard to provide 36-inches-minimum width for wheelchair users to sit in assembly areas. 36 C.F.R., Part 1191, Appendix D, § 802.1.2. This standard does not use the word "clear," and, therefore, a business does not, technically, run afoul of this standard if it has the required space but puts garbage cans in it. As discussed below, however, the *standards* cannot be divorced from the statutory scheme. In deciding a case like the present one, court and counsel do not have the DOJ's luxury of focusing only on the standard.

### *B. The ADA regulates both design and use regarding accessible features.*

Under the ADA, a business is required to "design and construct" facilities that are "readily accessible to and useable by individuals with disabilities . . . ." 42 U.S.C. § 12183(a)(1). Sitting en banc, the Ninth Circuit held that: "Whether a facility is readily accessible is defined, in part, by the ADA Accessibility Guidelines . . . The regulations establish a national standard for minimum levels of accessibility in all new facilities . . . [these] requirements are as precise as they are thorough, and the difference between

compliance and with the standard of full and equal enjoyment established by the ADA is often a matter of inches." *Chapman v. Pier 1 Imports (U.S.) Inc.*, 631 F.3d 939, 945–46 (9th Cir. 2011) (internal quotes and cites omitted for readability).  In this case, therefore, a 36-inch wide counter is the standard for determining whether it is readily accessible to and useable by wheelchair users.

But it is not just enough to build a compliant counter. A business has a duty to maintain that counter so that it is readily accessible to and useable for wheelchair users. 28 C.F.R. § 36.211(a).  As the DOJ formally explained (under a previous administration): "The Act requires that, to the maximum extent feasible, facilities must be accessible to, and usable by, individuals with disabilities. This section recognizes that it is not sufficient to provide features such as accessible routes, elevators, or ramps, if those features are not maintained in a manner that enables individuals with disabilities to use them." 28 C.F.R., Part 36, Appendix C, section 36.211.   The Access Board—the entity that promulgated the ADA Standards—recently released an animated video discussing the accessibility of counters and specifically stated that "it is important that accessible portions of counters be kept clear of merchandise displays and other objects." https://www.access-board.gov/guidelines-and-standards/buildings-and-sites/about-the-ada-standards/guide-to-the-ada-standards/animations (at 3:32 seconds).   And every court that has ruled on this topic has cited to this regulation.

- "Section 36.211(a) requires that once a facility is brought into compliance with the relevant standards, accessibility be maintained so that persons with disabilities may continue to access and use the facility." *Kalani v. Starbucks Corp.*, 81 F. Supp. 3d 876, 885 (N.D. Cal. 2015).

- "Starbucks Company failed to maintain a *readly accessible* thirty-six-inch-long point of sale counter at the Store, as required under the ADA." *Kalani v. Starbucks Coffee Co.*, 698 F. App'x 883, 886 (9th Cir. 2017) (emphasis added).
- "The regulations implementing ADA Title III . . . require that a public accommodation maintain in operable working condition those features of facilities and equipment that are required to be readly accessible to and usable by persons with disabilities by the Act or this part. 28 C.F.R. § 36.211(a)." *Chapman v. Pier 1 Imports (U.S.) Inc.*, 779 F.3d 1001, 1006 (9th Cir. 2015) (cites and quotes omitted).

All of this authority—the regulation, the Access Board's video, the court cases—were cited by Johnson in the supplemental brief to the DOJ but the DOJ never addressed this critical issue. The DOJ never mentions 28 C.F.R. § 36.211 or discusses the duty to maintain required-facility features in useable condition for wheelchair users. The DOJ's brief is silent on this issue, and the DOJ specifically says it is not opining on anything other than what the exact language of 904.4.1 requires as part of the as-built obligations. But the ADA concerns itself with the use of facilities just as much as the design of facilities. The Ninth Circuit discussed the distinction in *Fortyune v. AMC. Fortyune v. Am. Multi-Cinema, Inc.*, 364 F.3d 1075 (9th Cir. 2004). In *Fortyune*, a wheelchair user was unable to use a wheelchair seating area (and its companion seat) because a non-disabled person was sitting in the spot and AMC refused to make the person move. Although AMC argued that it was in compliance with the ADA Standards because it had the required accessible seating, the Ninth Circuit noted: "But in cases such as Fortyune's, which concern a public accommodation's policy regarding the use of that design (e.g., the use and availability of a companion seat), the provisions of the

ADAAG are not controlling . . . The ADDAG is silent regarding the actual use of those seats, but that is not surprising since the day-to-day use of the seats is not so much a 'design' issue as an operational one." *Id.* at 1085 (internal cites and quotes omitted).

Under this principle, it is not the lack of a 36-inch high, 36-inch long sales counter that is the problem; it is the failure to make it available for use by a wheelchair user. Just as the *Fortyune* plaintiff had his rights violated because the theater permitted the wheelchair seating space to be used for other purposes, here Plaintiff can certainly have her rights violated if Starbucks converts the existing 36-inch wide portion of counter to function as a merchandise display, removing it from use by wheelchair users. So, while the DOJ is technically correct that the plain language of 904.4.1 does not require any "clear" width whatsoever, that does not end the analysis. Plaintiff's complaint is an operational issue, i.e., "the use and availability" of the transaction counter . . . not whether the carpenter did his job in the first instance.

A store manager cannot point proudly to a lowered section of counter as a defense to the claim of discrimination if that counter is removed from use or converted to another use. Merely having a physically-lowered-sales counter might satisfy a building inspector who is checking off a box, but it does not address Ms. Lindsay's allegation that she was denied full and equal access because the required accessible feature (the lowered counter) was not made available to her. Clearly, taking a counter that has been built by a carpenter to be compliant with 904.4.1 and then rendering it unusable to wheelchair users by littering the counter with display and merchandise violates this obligation.

///

///

///

### III. It is Undisputed that the Parking Slope Exceeds 2.1% in Some Areas

In its Opposition to Plaintiff's Motion for Summary Judgment, filed November 19, 2018, Defendant Overland Partners Sepulveda, LLC submits photographic evidence that areas of its parking exceeds 2.1% (ECF 48, pg 5), but attempts to hand wave this problem away by suggesting on average the slope does not exceed 2.1%.

The ADAAG and ADAS provide for a maximum allowable slope of 2.1% on in parking areas. <u>This maximum allowable slope is not an average</u>. It means that the slope cannot exceed 2.1% at <u>any point</u> in the route.

Defendant suggests that would require some sort of measuring trickery to achieve a slope greater than 2.1%, yet defendants own briefing includes such a measurement. Further, the exact specifications of the level used are not provided, but it would appear from the photos the defendant's expert used a 24-inch level.

At this time, there are no industry standard protocols for measuring slopes although there are suggestions. The United States Access Board suggests three methods: (1) Hire a land surveyor to shoot grades; (2) Use a digital slope meter; <u>or</u> (3) use a 24" builders' level with a tape measure. Digital slope meters or smart levels come in a number of different lengths from 6", 12", 14", 24", and 48".

Although the U.S. Access Board suggests use of a 24" smart level, it is not to the exclusion of other methods of slope measurement. The longer the level the more it does averaging. It is therefore recommended that the level, regardless of size, be placed every 12" along the length of a sloped surface in order to test for surface variations and for flatness. Using a smaller level provides for better accuracy of subtle surface differentials for variation and flatness when measuring running slope. The longer the level the more average

a dimension you obtain. Spot checking using a six-inch level would provide the same, if not better results than a longer level in identifying excessive slopes that present barriers for wheelchair users, presuming one ensures neither level is sitting atop a loose stone or twig. Here, even with a long level, Defendant has confirmed the slope exceeds the maximum slope allowed by law.

## IV. CONCLUSION

Plaintiff respectfully requests this court grant her motion for summary judgment.

Dated: March 27, 2019   CENTER FOR DISABILITY ACCESS

By: /s/ Chris Carson
Chris Carson, Esq.
Attorneys for Plaintiff